UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

| | |
|---|---|
| MARK HOFFMAN, on behalf of himself and all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>REAGAN GOLD GROUP, LLC<br><br>Defendant. | Case No. 3:24-cv-6003 TMC<br><br>REAGAN GOLD GROUP'S MOTION TO SET ASIDE DEFAULT AND MEMORANDUM IN SUPPORT<br><br>NOTE ON MOTION CALENDAR:<br>May 16, 2025<br>LCR 7(d)(3) |

## MOTION TO SET ASIDE DEFAULT

COMES NOW, Defendant Reagan Gold Group, LLC ("Defendant"), through its counsel, and moves to set aside the Default entered on January 31, 2025, pursuant to Federal Rule of Civil Procedure 55(c), due to inadvertent oversight and excusable neglect. In support of this Motion, Defendant states as follows:

1.      On December 10, 2024, Defendant was served with the Complaint filed by Plaintiff Mark Hoffman on behalf of himself and all other similarly situated. The deadline for Defendant to file a responsive pleading was January 2, 2025. Due to inadvertent oversight and excusable neglect, Defendant failed to file a timely response.

MOTION TO SET ASIDE DEFAULT AND MEMORANDUM IN SUPPORT - 1

2.    On January 30, 2025, Plaintiff filed a Motion for Clerk's Entry of Default against Defendant. Subsequently, on January 31, 2025, the Clerk of Court entered a Default against Defendant pursuant to Fed. R. Civ. P. 55(a).

3.    Federal Rule of Civil Procedure 55(c) allows the court to set aside an Entry of Default for "good cause shown." The factors considered in determining "good cause" include whether the Default was willful, whether the defendant has a meritorious defense, and whether setting it aside would prejudice the plaintiff.

4.    Defendant respectfully submits that good cause exists to set aside the Default for the following reasons:

> **Lack of Willfulness:** The failure to respond was not willful but rather due to an inadvertent oversight. Defendant has acted promptly upon realizing the Default to rectify the situation.

> **Meritorious Defense:** Defendant has recognizable meritorious defenses to the claims asserted by Plaintiff. Defendant intends to file a responsive pleading that will demonstrate the lack of liability and the existence of valid defenses.

> **No Prejudice to Plaintiff:** Setting aside the Default will not prejudice Plaintiff. The litigation is in its early stages, and Plaintiff will not be deprived of any opportunity to pursue the claims on their merits.

5.    A memorandum in support of this motion is filed concurrently herewith, detailing the factual and legal basis for setting aside the Default.

WHEREFORE, Defendant Reagan Gold Group, LLC respectfully requests that this Court **GRANT** its Motion to Set Aside Default and allow Defendant to file its responsive pleading within a time frame deemed appropriate by the Court.

## MOTION TO SET ASIDE DEFAULT

### I.    Statement of Facts

Reagan Gold Group, LLC is a small family-run company with fewer than 10 salespeople, recognized for its high standards of business practices and customer satisfaction as evidenced by commendable ratings from the Better Business Bureau and the Business Consumer Alliance.

Since April 10, 2024, Reagan has relied on Nick Munoz of Data Alliance Group to provide exclusive leads from individuals who consented to receive a gold guide via SMS. Reagan was assured of compliance with the Telephone Consumer Protection Act ("TCPA") based on the exclusivity and consent associated with these leads.

Reagan employs Salesforce as its customer relationship management system, which includes safeguards to adhere to individual requests to no longer be contacted. This system covers all communication channels, including phone calls, SMS, and email. Reagan's sales team is trained to comply with these procedures to avoid contacting uninterested individuals. Additionally, the sales team is disincentivized from contacting uninterested individuals because they are rewarded on a commission basis.

Mr. Hoffman's phone number was acquired from Data Alliance Group, and records show he opted-in by expressing consent in receiving information. Reagan contacted Mr. Hoffman 35 times, including 17 unanswered calls, 2 busy signals, 1 call to a disconnected number, 2 emails, 12 text messages, and 1 answered call. Each call was manually dialed. Upon his request to cease communications, Reagan promptly updated his record to ensure no further contact.

Following service of the Summons and Complaint on December 10, 2024, Mary Boston, the Chief Financial Officer of Reagan, attempted to negotiate a settlement with Mr. Strauss, who indicated that neither he nor the class were interested in negotiation and would seek a Default Judgment if Reagan did not formally respond to Mr. Hoffman and the Class' filed Complaint.

1

2        Unfamiliar with the legal process, Reagan began searching for legal counsel. Despite challenges,

3    Reagan secured legal representation on February 28,2025, when Mr. David M. Rose filed his Notice of

4    Appearance with the court.

5        Reagan remains committed to compliance with the TCPA and regularly updates its internal do-not-

6    call list. Any calls to numbers on the national do-not-call registry were inadvertent errors, and Reagan has

7    undertaken a thorough review of its procedures to ensure adherence to all relevant regulations.

8                                    **II.    Legal Analysis**

9        Defendant moves to set aside the Default entered on the 31st of January 2025, by the Clerk of the

10    U.S. District Court for the Western District of Washington. This motion is made prior to the Default

11    Judgment. Motions to set aside Default are governed by Federal Rule of Civil Procedure 55(c). The rule

12    provides that entry of Default may be set aside upon a showing of "good cause." In determining whether

13    good cause has been shown, a district court must consider: (1) whether the Default resulted from culpable

14    conduct on the part of the defendant; (2) whether the defendant has a meritorious defense; and (3) whether

15    the plaintiff would be prejudiced by setting aside the Default. *TCI Grp. Life Ins. Plan v. Knoebber*, 244

16    F.3d 691, 696 (9th Cir. 2001) (citing the "*Falk* factors" first articulated in *Falk v. Allen*, 739 F.2d 461, 463

17    (9th Cir. 1984)). "To be prejudicial, the setting aside of a [Default] must result in greater harm than simply

18    delaying resolution of the case." *Id.* at 701 (identifier added). When a motion to set aside a Default is filed

19    prior to the entry of Default Judgment, the district court has "especially broad" discretion in deciding

20    whether to grant relief. *Brady v. United States*, 211 F.3d 499, 504 (9th Cir. 2000).

21        This court should find that Reagan has established good cause to set aside the Default. As a

22    fundamental principle, the law prefers to resolve cases based on their merits rather than through Default

23    Judgments; consequently, this general rule disfavors Defaults. In *Falk*, the Ninth Circuit articulated that

24    Default and Default Judgment are "a drastic step appropriate only in *extreme circumstances*; a case should,

25    whenever possible, be decided on the merits." 739 F.2d at 463 (emphasis added). *See Eitel v. McCool*, 782

F.2d 1470 (9th Cir. 1986) ("the general rule [is] that Default Judgments are ordinarily disfavored. Cases should be decided upon their merits whenever reasonably possible") (quoting *Pena v. Seguros La Comercial, S.A.*, 770 F.2d 811, 814 (9th Cir. 1985)). The "extreme circumstances" policy language is meant to remind courts that Defaults and Default Judgments are exceptions, not the norm, and should be viewed with great suspicion. *United States v. Aguilar*, 782 F.3d 1101, 1106 (9th Cir. 2015). Ergo, when courts apply the *Falk* factors, they must keep this policy concern in mind. *Id.*

1. *Culpable conduct*

Turning to the first of the three *Falk* factors – "whether the Default resulted from culpable conduct on the part of the defendant" – the Plaintiff has neither presented nor is there any credible evidence indicating that the Default resulted from culpable conduct. In *Falk*, the Ninth Circuit stated that the "court will accept the allegations of the movant's factual statement." 739 F.2d at 464. Further, a defendant's conduct may be deemed "culpable" only if they have "received actual or constructive notice of the filing of the action and *intentionally* failed to answer." *United States v. Signed Personal Check No. 730 of Yubran S. Mesle*, 615 F.3d 1085, 1092 (9th Cir. 2010) (emphasis in original) (quotation and citation omitted). The Ninth Circuit explained in *Mesle* that "in this context the term 'intentionally' means that a movant cannot be treated as culpable simply for having made a conscious choice not to answer; rather, to treat a failure to answer as culpable, the movant must have acted with bad faith, such as an intention to take advantage of the opposing party, interfere with judicial decision-making, or otherwise manipulate the legal process." *Id.* (quoting *TCI Grp.*, 244 F.3d at 697). Thus, presentation of a failure to file an answer cannot defeat a showing of good cause under Rule 55(c) unless there is evidence that the defendant acted deliberately circuitous, willfully or in bad faith. *Id.*

This approach is aligned with the Supreme Court's decision in *Pioneer Investment Services Co. v. Brunswick Associates Ltd.*, which clarified that mere carelessness does not automatically render negligent failure to respond as inexcusable. 507 U.S. 380, 388 (1993). The Court emphasized that, absent a strong

showing of other equitable factors, such as significant prejudice, a motion to set aside a Default should not be denied solely on the basis of simple negligence. *Id.* at 394-95.

In the present case, the circumstances indicate that the neglect was not deliberately circuitous, willfully or in bad faith. Mr. Hoffman filed the complaint on December 5th, 2024 (ECF No. 1), and propounded service on Reagan – at their offices, via their front desk employee – on December 10th, 2024 (ECF No. 4). Later on December 10th, after service was propounded, Ms. Mary Boston, the Chief Marketing Officer for Reagan, emailed Mr. Strauss to inquire about how to settle the matter and to inform him that Reagan did not wish to proceed with a legal suit. She explained that Reagan was a small family-run business with 10 people in sales, a 4.95 Better Business Bureau ("BBB") rating, and a AAA Business Consumer Alliance ("BCA") rating.

The following day, on December 11th, Mr. Paronich responded to her email, informing her that this was not only a suit by Mr. Hoffman but also a class action. He stated that if Reagan did not intend on going to court, they would have a Default entered against them, and the court would order Reagan to pay a judgment for all alleged damages. After this conversation and unfamiliar with the legal process, Reagan sought legal counsel and conferred with Mr. Tim J. Filer for the limited purpose of settling the matter without litigation. Based on their unfamiliarity with the legal process, Reagan reasonably believed that the litigation was at a hold until a settlement had been attempted.

Nonetheless, given the Federal Rules of Civil Procedure's (FRCP) 21-day response deadline, the timing of the filing, service, and especially the response, directly coincided with the heart of the holiday season. Nevertheless, following the holiday season but before the Default was entered, Mr. Filer reached out to Mr. Paronich to explore a settlement. Mr. Paronich asked if Mr. Filer was the attorney of record in the matter, and when told no, he stated that he was not interested in engaging in settlement negotiations. Instead, he notified Mr. Filer that he intended to get an entry of Default from the court. Default was sought and entered on January 31, 2025 (ECF No. 6).

Upon notice of Mr. Hoffman and the Class' unwillingness to negotiate a settlement and the Default entry, Reagan promptly began searching for legal representation. After researching attorney options in the state of Washington, Reagan held conference calls with Jeff Scott of Greenberg Traurig, Thomas Godwin of Ellis George LLP, Raymond Kim of Ray Kim Law, and finally David Rose of PNW Family Law. After a thorough search for representation to the action, counsel was secured on February 28, 2025, on which Mr. Rose filed his Notice of Appearance with the court (ECF No. 7). Reagan's failure to respond to the complaint in a timely manner did not allow them to "take advantage" of Mr. Hoffman and the Class, nor to "manipulate the legal process." The only consequence of Reagan's failure was the entry of Default and an increased risk of losing their financial assets, which they can only protect by participating in the legal process. This behavior does not amount to culpable conduct.

In contrast, culpable behavior typically involves actions by parties designed to retain property and avoid liability by evading court proceedings, such as companies avoiding service in order to thwart their customers' attempts to bring suit against them. Despite Reagan's failure to respond and the subsequent Default entry leveled against them, this court should find that Reagan's non-response was due to simple excusable neglect rather than an intentional attempt to manipulate the legal process because the Ninth Circuit requires such evidence and neither Mr. Hoffman nor the Class can provide this to the court.

2. *Meritorious Defense*

The second *Falk* factor requires the court to consider "whether the defendant has a meritorious defense." This court should find that Reagan has both meritorious defenses and disputes that it engaged in any violation of the Telephone Consumer Protection Act of 1991 ("TCPA"). Under Rule 55(c), a district court may deny relief if the moving party has failed to show that they have a "meritorious defense." *Falk*, 739 F.2d at 463. "All that is necessary to satisfy the 'meritorious defense' requirement is to allege sufficient facts that, if true, would constitute a defense: 'the question whether the factual allegation [i]s true' is not to be determined by the court when it decides the motion to set aside the Default. Rather, that question 'would be the subject of the later litigation.'" *Mesle*, 615 F.3d at 1094 (alteration in original) (citation omitted)

(quoting *TCI Grp.*, 244 F.3d at 700). This approach aligns with the principle that "the burden on a party seeking to vacate a Default Judgment is not extraordinary heavy." *TCI Grp.*, 244 F.3d at 700.

The TCPA's Do-Not-Call provision states "persons or entities making calls for telemarketing purposes … must honor a residential subscriber's do-not-call request within a reasonable time… ." 47 C.F.R. § 64.1200(d)(3) (2011) (amended 2012). "Telemarketing means the initiation of a telephone call or message for the purpose of encouraging the purchase or rental of, or investment in, property, goods, or services, which is transmitted to any person" by the seller. *Id.* § 64.1200(f)(10). Non-commercial calls are not a violation of the TCPA. 47 U.S.C. §227(b)(2)(B)(i). Additionally, the FCC may exempt calls made for commercial purposes, provided that these calls (I) do not adversely affect the privacy rights that this section aims to protect; and (II) do not include the transmission of any unsolicited advertisement. *Id.* " 'Unsolicited advertisement' means any material advertising the commercial availability or quality of any property, good, or services which is transmitted to any person without that person's prior express invitation or permission…" by the seller or their agent. *Id.* § 227(a)(5).

Here, Reagan asserts that they have adhered to the TCPA regulations by refraining from sending solicitation messages. Instead, they have provided courtesy messages to the general public, which contain informative, yet publicly available, communications related to gold (ECF No. 1 at 5) and the more limiting "opt-in" approach that the FCC expressly declined to adopt because they considered the "opt-in" approach would be overly restrictive on the telemarketing industry. Even still, none of the messages sent to any member of the Class, including Mr. Hoffman, requested or encouraged the recipient to purchase gold from Reagan, either at the time the message was received or in the future (ECF No. 1 at 5).

Reagan, being astute in understanding human behavior, recognized that informed individuals make better choices. Therefore, Reagan's primary goal was to provide information to individuals, enabling them to make better investment decisions, evidenced by the "FREE 2024 Gold Guide". *Id.* Reagan did not

concern themselves with whether recipients purchased gold from them, as long as they were aware of the option to add gold to their portfolio.

The rationale behind this approach is not to advertise or sell something directly or indirectly to the recipient. Rather, it was, and should be interpreted as, an effort to inform the recipient generally, because an increase in gold purchases leads to a higher gold price, which is likely to benefit any holder of gold. However, the fact that Reagan may indirectly benefit does not undermine their intention to inform the general public about the value of adding gold to their retirement portfolios. These messages were not motivated in whole, or in part, by the desire for the recipient to ultimately purchase goods or services from Reagan. Moreover, Reagan avers two meritorious defenses in the alternative: (a) Reasonable Practices and Procedures; and (b) Established Business Relationships.

    **a.** *Reasonable Practices and Procedures*

"It shall be an affirmative defense in any action brought under this paragraph that the defendant has established and implemented, with due care, reasonable practices and procedures to effectively prevent telephone solicitations in violation of the regulations prescribed under this subsection." 47 U.S.C. §227(c)(5). Congress entrusted the FCC with the enforcement, qualification, and creation of new regulations to effectuate the true purpose of the TCPA. In 2003, the FCC promulgated the regulations that currently govern telemarketing solicitations and defined the actions by telemarketers that constitute due care, reasonable practices, and procedures.

These regulations prohibit initiating calls to residential telephone subscribers before 8 a.m. or after 9 p.m. local time, and to those who have registered their numbers on the national do-not-call registry. 47 C.F.R. § 64.1200(c)(1)-(2) (2023). Compliance requires establishing written procedures, training personnel, maintaining a list of numbers not to contact, and using a version of the national do-not-call registry obtained no more than 31 days prior to making calls. *Id.* Additionally, telemarketers must ensure the national do-not-call database is used solely for compliance purposes and not for any other commercial use. *Id.*

Alternatively, telemarketers can avoid liability if they have obtained the subscriber's prior express invitation or permission, evidenced by a signed, written agreement, or if they have a personal relationship with the recipient of the call. *Id.* These measures are essential to demonstrate adherence to TCPA regulations and avoid violations.

In the present case, Reagan asserts that they have never placed any calls or sent text messages to any member of the Class, including Mr. Hoffman, between the hours of 9 p.m. and 8 a.m. local time. Reagan further avers that they did not make any calls to individuals registered on the national do-not-call registry who had not opted-in prior to Reagan's calls or texts about their services. If Reagan did place any call to anyone who was on the national do-not-call registry it was the result of error. Reagan maintains that their routine business practices meet the FCC's required standards because they have established and implemented a written policy, which is used to train their personnel. This policy explicitly directs personnel not to contact individuals who request not to be contacted or those who are on Reagan's internal do-no-call registry. Further, Reagan's sales representatives are incentivized to accurately document the results of any call because they are monetary compensated for transactions that result from qualified conversations.

Reagan emphasizes that the list of individuals contacted by its personnel consists solely of those who had previously opted-in, including Mr. Hoffman. Additionally, to ensure compliance with the requirement to use a version of the national do-not-call registry obtained no more than 31 days prior to making calls, Reagan immediately updates its records and never cold-calls. This diligent approach demonstrates Reagan's commitment to adhering to TCPA regulations and avoiding violations.

**b.** *Established Business Relationships*

An " established business relationship" is defined in 47 CFR § 64.1200(f)(5) as "a prior or existing relationship formed by a voluntary two-way communication between a person or entity and a business or residential subscriber, based on an inquiry, application, purchase or transaction by the business or residential subscriber regarding products or services offered by such person or entity."

In the present case, Reagan asserts that it maintained an established business relationship with the individuals it contacted, including Mr. Hoffman, in compliance with the TCPA. Reagan's relationship with Mr. Hoffman and other individuals was initiated through their expressed interest in receiving a gold guide, which they requested to learn more about gold and silver as investment options for their savings and retirement. This interest was captured through leads provided by Data Alliance Group, a trusted partner that supplied exclusive leads from individuals who electronically consented to receive such information via SMS. Reagan relied on these leads, assured of their compliance with TCPA regulations due to the consent obtained by Data Alliance Group.

The nature of communications between Reagan and these individuals was strictly informational and responsive, focusing on providing valuable insights into gold investments rather than unsolicited advertisements. Reagan's communications were formed by a voluntary two-way communication between the receiver and them designed to inform and educate, not to solicit purchases directly. This approach aligns with the TCPA's provisions, which allow for communications that do not include unsolicited advertisements.

### 3. *Prejudice*

The final *Falk* factor directs to the court to consider "whether the plaintiff would be prejudiced by setting aside the Default" and this court should find that the Mr. Hoffman and the Class would not be prejudiced by an order setting aside the Default. As established in *TCI Grp.*, "the setting aside of a [Default] must result in greater harm than simply delaying resolution of the case." 244 F.3d at 696. The standard is whether [the] plaintiff's ability to pursue [their] claim will be hindered. *Id*.

In the present case, time is not necessarily of the essence. The claims concern whether unsolicited calls were made to the plaintiffs. Any alleged prejudice due to time elapsed since the Default was entered and during the pendency of this motion will not cause witnesses' memories to fade or loss of any other evidence that would assist in establishing plaintiffs' claim, thereby impeding the judicial process or

MOTION TO SET ASIDE DEFAULT AND MEMORANDUM IN SUPPORT - 11

hindering fairness towards the plaintiffs. The time elapsed during this motion is less than that of an appeal. On appeal, the prevailing party below may not seek to profit from errors made in their favor by arguing that the time taken by the appellate court to correct those errors has caused prejudice. Such prejudice should be treated as if it had existed at the time that the district court made its initial determination, so as to bar relief to the appellant. Likewise, the time spent on this remedial step of setting aside the Default entry reflects that Mr. Hoffman and the Class will not be hindered by an order setting aside the Default.

### III.    Conclusion

In sum, this court should find, as a matter of law, that all three of the *Falk* factors required for a showing of "good cause" in an analysis for setting aside Default under Rule 55(c) favor Reagan. First, their conduct leading to the Default entry was not culpable. Second, they have presented facts sufficient to establish more than one meritorious defense. Third, setting aside the Default would not prejudice Mr. Hoffman and the Class. Therefore, for the reasons stated, Defendant respectfully requests that the Court **GRANT** Reagan's motion to set aside the Default, allowing the case to proceed on its merits.

RESPECTFULLY SUBMITTED AND DATED this 24th day of April 2025.

By: _____

David M. Rose, WSBA #32849

Email: dmr@pnwfamilylaw.com
216 South Palouse Street
Walla Walla, WA 99362
Telephone: (509) 572-3700
Fax: (509) 572-3701

*Attorneys for Defendant*

MOTION TO SET ASIDE DEFAULT AND MEMORANDUM IN SUPPORT - 12